**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

———————————

No. 24-1186

———————————

**UNITED STATES OF AMERICA,**

Appellee,

v.

**JERRY D. BEDELL,**

Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, SOUTHERN DIVISION
HONORABLE ROSEANN KETCHMARK, DISTRICT JUDGE

———————————

**BRIEF FOR THE UNITED STATES**

———————————

TERESA A. MOORE
  United States Attorney

DAVID WAGNER
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

# SUMMARY OF THE CASE

Jerry Bedell pleaded guilty, without a plea agreement, to conspiracy to distribute heroin and fentanyl, and to possessing three firearms in furtherance of that drug conspiracy. The district court sentenced him to a total prison term of 360 months. Bedell appeals his sentence on procedural grounds.

Bedell first challenges the district court's drug-quantity finding, which determined his base offense level under the Sentencing Guidelines. Under the Guidelines' principle of jointly undertaken criminal activity, the district court did not clearly err by finding Bedell accountable for the total quantity of drugs distributed by both Bedell and his father and co-conspirator, Jerry Wheeler.

Bedell also challenges the district court's application of three offense-level enhancements: three levels for the aggravating role he played in the criminal activity, two levels for maintaining a drug premises, and two levels for engaging in a pattern of criminal conduct as a livelihood. The Government agrees with Bedell that the district court erred by applying these enhancements. Bedell objected to the factual statements in his presentence investigation report that supported these enhancements, and the Government failed to present evidence proving those facts at sentencing. This Court should reverse the application of these enhancements and remand for resentencing.

Oral argument is unnecessary.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE.......................................................................... i

TABLE OF CONTENTS............................................................................. ii

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF THE ISSUE....................................................................1

STATEMENT OF THE CASE ....................................................................2

A.     Crimes...........................................................................................2

B.     Guidelines Recommendations and Objections......................................8

C.     Sentencing ...................................................................................13

SUMMARY OF THE ARGUMENT ...........................................................15

ARGUMENT

The district court did not clearly err by finding the applicable drug
quantity to be the total volume of drugs distributed by both Bedell and
Wheeler, but it did err by applying three offense-level enhancements
based upon objected-to and unproved allegations in the PSR......................17

A.     Standard of Review ........................................................................17

B.     Discussion....................................................................................17

       1.     The district court did not clearly err by finding Bedell
              accountable for the quantity of drugs distributed by both
              Bedell and Wheeler...............................................................17

       2.     The district court erred by applying the three offense-level
              enhancements .......................................................................26

CONCLUSION................................................................29

CERTIFICATE OF COMPLIANCE............................................30

CERTIFICATE OF SERVICE ...............................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Greer v. United States*, 593 U.S. 503 (2021)........................................ 23, 25

*United States v. Angel*, 93 F.4th 1075 (8th Cir. 2024) .................................17

*United States v. Bennett*, 91 F.4th 918 (8th Cir. 2024) ............................1, 18

*United States v. Berrier*, 28 F.4th 883 (8th Cir. 2022).................................27

*United States v. Bradley*, 643 F.3d 1121 (8th Cir. 2011) ...................... 18, 19

*United States v. Buford*, 42 F.4th 872 (8th Cir. 2022)..................................17

*United States v. Edwards*, 994 F.2d 417 (8th Cir. 1993)..............................24

*United States v. Flores*, 73 F.3d 826 (8th Cir. 1996) ...................................24

*United States v. Flores-Alvarado*, 779 F.3d 250 (4th Cir. 2015) ........... 23, 24

*United States v. Jones*, 990 F.3d 1141 (8th Cir. 2021).................................23

*United States v. Lee*, 570 F.3d 979 (8th Cir. 2009) ......................................19

*United States v. Lewis*, 976 F.3d 787 (8th Cir. 2020) ..............................1, 22

*United States v. Mayokok*, 854 F.3d 987 (8th Cir. 2017) .................. 1, 26, 27

*United States v. Miller*, 698 F.3d 699 (8th Cir. 2012)...................................24

*United States v. Shaw*, 965 F.3d 921 (8th Cir. 2020) ........................ 1, 22, 23

*United States v. Wiggins*, 747 F.3d 959 (8th Cir. 2014)...............................26

*United States v. Williams*, 605 F.3d 556 (8th Cir. 2010)....................... 18, 21

## Statutes

18 U.S.C. § 922......................................................................2

18 U.S.C. § 924......................................................................2

18 U.S.C. § 3553..................................................................13

21 U.S.C. § 841......................................................................2

21 U.S.C. § 846......................................................................2

## Rule

Fed. R Crim. P. 32 .......................................................... 24, 26

## Sentencing Guidelines

U.S.S.G. § 1B1.3...................................................................18

U.S.S.G. § 2D1.1 ................................................... 9, 12, 17, 27

U.S.S.G. § 3B1.1..............................................................9, 27

U.S.S.G. § 4B1.1..............................................................9, 25

## STATEMENT OF THE ISSUE

Whether the district court clearly erred by finding the applicable drug quantity to be the total volume of drugs distributed by both Bedell and Wheeler, and whether it erred by applying three offense-level enhancements based upon objected-to and unproved allegations in the PSR.

## Cases

*United States v. Bennett*, 91 F.4th 918 (8th Cir. 2024)

*United States v. Lewis*, 976 F.3d 787 (8th Cir. 2020)

*United States v. Shaw*, 965 F.3d 921 (8th Cir. 2020)

*United States v. Mayokok*, 854 F.3d 987 (8th Cir. 2017)

# STATEMENT OF THE CASE

## A.    *Crimes*

A grand jury charged Bedell with four counts in a multi-defendant superseding indictment: conspiracy to distribute one kilogram or more of heroin and 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count One); possession with intent to distribute some quantity of heroin and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count Twenty Four); possessing three firearms in furtherance of Counts One and Twenty Four, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Twenty Five); and being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count Twenty Six). (R. Doc. 195.) Bedell pleaded guilty, without a written plea agreement, to Counts One and Twenty Five. (Plea Tr.[1]; R. Doc. 496; R. Doc. 503.)

Bedell's presentence investigation report (PSR), and a stipulation of facts Bedell signed in connection with his guilty plea, together describe the circumstances of Bedell's crimes. A man named Jerry Wheeler, who is Bedell's biological father, supplied fentanyl to a group of individuals who distributed it in the Springfield, Missouri, area. (R. Doc. 496, at 2; PSR ¶¶ 4,

---

[1]"Plea Tr." refers to the transcript of Bedell's change-of-plea hearing. (R. Doc. 497.)

6.) Wheeler obtained the fentanyl from Sheron Loggins, who was based in St. Louis. (R. Doc. 496, at 2; PSR ¶ 6.) Bedell distributed fentanyl for Wheeler, as did Bedell's biological mother Nichole Bedell, Bedell's former wife Bethany Rice, and several others. (R. Doc. 496, at 2; PSR ¶ 6.) Wheeler, Loggins, Nichole Bedell, and Rice were all co-defendants with Bedell in the case below. (R. Doc. 195.) The members of the conspiracy generally referred to the product they were distributing as heroin, but laboratory analysis showed that the conspirators widely distributed fentanyl. (PSR ¶ 6.)

In April 2019, DEA agents contacted another co-defendant named Laurel Lindsey after watching what they believed to be a drug transaction between Lindsey and Bedell. (PSR ¶ 8.) Lindsey admitted she had just purchased about four grams of heroin from Bedell, and she also admitted purchasing between four and eight grams of heroin from Bedell almost every day for the past three months. (PSR ¶ 9.) Lindsey had previously bought heroin from Wheeler and had bought about five grams per day from Wheeler over a five-year period. (PSR ¶ 9.) However, after Wheeler started suspecting federal agents were following him, he introduced Lindsey to Bedell and told her she would receive heroin from Bedell going forward. (PSR ¶ 9.) Lindsey told law enforcement that Bedell often fronted her heroin, and she currently owed him money. (PSR ¶ 9.)

Lindsey agreed to assist law enforcement with making a controlled payment to Bedell for heroin. (PSR ¶ 10.) When Lindsey met with Bedell, they discussed Lindsey's interaction with law enforcement, and Bedell told Lindsey, "'It is my business where you're at, it is my business what happened to you, because that [expletive] snorts my dope, snorts my daddy's dope.'" (PSR ¶ 10.) Bedell was suspicious and refused to provide Lindsey any heroin. (PSR ¶ 10.) Bedell told Lindsey he would not sell her distribution amounts of heroin for the time being but would provide her with user amounts so she did not get sick. (PSR ¶ 10.)

A few days later, police officers encountered Bedell, Wheeler, and Rice (Bedell's former wife) in two cars in a parking lot. (PSR ¶ 11.) Officers found on Bedell's person over $5,000 in cash, and they found in Rice's car over $3,000 in cash, which Bedell said was his. (PSR ¶ 12.) Officers found over $8,000 in cash in a bag belonging to Wheeler. (PSR ¶ 12.) Some of the bills belonging to Bedell and Wheeler contained serial numbers that matched currency previously used in a controlled payment of drug debt. (PSR ¶ 12.) Bedell later told someone that he and Wheeler had been stopped on their way to St. Louis. (PSR ¶ 13.) St. Louis is where Loggins, who was Wheeler's source of supply, was operating. (PSR ¶ 6.)

In June 2019, officers saw Nichole Bedell (Bedell's mother) conduct what they suspected to be a drug transaction with the occupant of another vehicle in a parking lot. (PSR ¶ 22.) Officers stopped the other vehicle and found a small amount of heroin. (PSR ¶ 22.) The driver, Michelle Mueller, admitted purchasing heroin and said she had bought as much as one-half gram from Bedell per day. (PSR ¶ 22.) Text messages between Bedell and Mueller indicated that Bedell had sent his mother to conduct the drug transaction with Mueller that day. (PSR ¶ 22.)

In August 2019, Wheeler and Bedell spoke by phone about Wheeler going away for a court date. (PSR ¶ 23.) Wheeler asked Bedell if he wanted anything and Bedell said he did, which law enforcement believed to mean that Wheeler would supply Bedell with enough heroin or fentanyl to sell while Wheeler was away. (PSR ¶ 23.) Later that same day, officers saw Wheeler carrying a small backpack inside Bedell's home. (PSR ¶ 23.) A couple days later, Wheeler asked Bedell by phone if he needed any more product, and Bedell indicated that he still had his current supply. (PSR ¶ 23.)

On September 8, 2019, law enforcement intercepted Loggins (Wheeler's fentanyl supplier) as Loggins was driving from St. Louis to Springfield. (PSR ¶ 20; R. Doc. 496, at 2.) Officers found in Loggins's vehicle over 400 grams of fentanyl, which Loggins had been planning to deliver to

Wheeler for further distribution. (PSR ¶ 20; R. Doc. 496, at 2.) That same day, Wheeler called Bedell and told Bedell that Loggins was not answering his calls. (PSR ¶ 21.) Wheeler told Bedell cryptically that Bedell should keep half of something for himself. (PSR ¶ 21.) Bedell then called Rice and told her about Loggins's arrest and that Wheeler had spoken about keeping half of some quantity of heroin for himself. (PSR ¶ 21.)

On September 12, 2019, Bedell told co-defendant Delante Worsham that he had obtained what he believed to be fentanyl and planned to mix it with heroin to distribute to his customers. (PSR ¶ 24.) Worsham agreed to help Bedell mix the heroin and fentanyl. (PSR ¶ 24.) Officers conducting surveillance at Bedell and Rice's home saw Worsham and a woman arrive at the home and then leave a short time later. (PSR ¶ 25.) Officers executed a search warrant at the home later that same day and found and seized three firearms (which formed the basis for the charge against Bedell in Count Twenty Five), three grams of heroin or fentanyl, and three grams of fentanyl. (PSR ¶¶ 26-27.) Officers also found, but did not seize, a drug ledger and $3,000 cash. (PSR ¶ 26.) Bedell spoke to Wheeler by phone that night, and Wheeler asked if law enforcement had seized Bedell's money. (PSR ¶ 28.) Bedell assured Wheeler the officers had not found his money. (PSR ¶ 28.)

In November 2019, Bedell and Wheeler spoke by phone, and officers understood the call to be about Bedell getting out of the house and selling heroin to make money for Wheeler. (PSR ¶ 30.) Wheeler told Bedell to go to Walmart and buy a new phone. (PSR ¶ 30.) Two days later, officers saw Bedell conduct what they suspected to be three drug transactions. (PSR ¶ 31.)

Rice was arrested and interviewed, and she told officers that she and Bedell began buying heroin from Wheeler in 2015. (PSR ¶¶ 33, 39.) Rice also told officers that in 2018 Bedell began selling heroin he purchased from Wheeler and that Bedell obtained multiple ounces of heroin from Wheeler at a time. (PSR ¶ 33.) Wheeler fronted the heroin to Bedell, and Bedell paid Wheeler $1,800 to $1,900 per ounce. (PSR ¶ 33.) Rice admitted she assisted Bedell with selling heroin. (PSR ¶ 33.)

During one post-arrest interview, Bedell told officers that he sold approximately 28.5 grams of heroin per day. (PSR ¶ 39.) Based on the information from Bedell and Rice, Bedell's PSR estimated that Bedell sold a total of just over 10 kilograms of heroin or fentanyl. (PSR ¶ 39.)

During her interview with law enforcement, Rice discussed some of Bedell's heroin customers. She said that Lindsey sold heroin for Wheeler but eventually began buying it from Bedell rather than directly from Wheeler. (PSR ¶ 34.) Rice identified co-defendant Marquise Martin as another

customer and said that Bedell sold Martin approximately an ounce of heroin every other day for two or three months at the price of $2,000 per ounce. (PSR ¶ 35.) Martin eventually started obtaining his heroin directly from Wheeler. (PSR ¶ 35.) Rice also said that at one point, Wheeler gave Bedell a phone containing phone numbers for some of Wheeler's customers so that Bedell could take over distribution to those customers. (PSR ¶ 34.)

Rice said that Bedell put a safe in the home of Nichole Bedell to store heroin. (PSR ¶ 36.) When Bedell and Rice were travelling, Bedell would leave between eight and 10 grams of heroin in the safe so that Nichole Bedell could sell to his regular customers while he was gone. (PSR ¶ 36.) Rice also said that Nichole Bedell would occasionally drive Bedell around while he sold heroin. (PSR ¶ 36.)

Another co-defendant named William Leath told officers that he and three others sold one kilogram of heroin for Wheeler about every two weeks between June 2018 and February 2019. (PSR ¶ 38.) The PSR estimated that these four individuals collectively obtained approximately 16 kilograms of heroin or fentanyl from Wheeler. (PSR ¶ 38.)

## B.     *Guidelines Recommendations and Objections*

For purposes of calculating Bedell's Sentencing Guidelines range, the PSR estimated that the overall amount of fentanyl involved in the conspiracy

was between 12 and 36 kilograms. (PSR ¶ 40.) The PSR recommended Bedell be held accountable for at least 12 kilograms of fentanyl based upon his own fentanyl sales and his jointly undertaken criminal activity with Wheeler. (PSR ¶¶ 40, 46.) A quantity of 12 to 36 kilograms of fentanyl yields a base offense level of 36. *See* U.S.S.G. § 2D1.1(c)(2).

The PSR also recommended three enhancements to the base offense level: a two-level enhancement for maintaining a premises (Nichole Bedell's house) for the purpose of distributing a controlled substance, *see* U.S.S.G. § 2D1.1(b)(12); a three-level aggravating-role enhancement for being a manager or supervisor in the criminal activity, *see* U.S.S.G. § 3B1.1(b); and a two-level enhancement for committing the offense as part of a pattern of criminal conduct engaged in as a livelihood, *see* U.S.S.G. § 2D1.1(b)(16)(E). (PSR ¶¶ 47, 48, 50.) After applying a three-level reduction for acceptance of responsibility, the PSR calculated a total offense level of 40. (PSR ¶¶ 54-56.)

The PSR noted that Bedell qualified as a career offender under § 4B1.1 of the Guidelines due to prior Missouri convictions for unlawful use of a weapon and second-degree domestic assault. (PSR ¶ 53.) However, because the offense-level of 34 (including acceptance-of-responsibility reductions) under the career-offender provision would be lower than the otherwise-

applicable offense level of 40, the offense level was not set by the career-offender provision. (PSR ¶ 53.)

The PSR determined that Bedell had a criminal history category of VI. (PSR ¶ 73.) With an offense level of 40, Bedell's recommended Guidelines range was 360 months to life on Count One, and a consecutive 60 months on Count Twenty Five. (PSR ¶ 121.)

Prior to sentencing, Bedell objected to the PSR's recommendations regarding drug quantity, as well as the three offense-level enhancements. (PSR Adden., at 2-5.) For each of these issues, Bedell objected to the PSR's "factual assertion and legal conclusion" that he should be held responsible for the drug quantity or subject to an enhancement. (PSR Adden., at 2-4.) Only in his objection to the aggravating-role enhancement did Bedell object to any specific factual allegations in the PSR, but the facts he objected to also implicated the drug-premises enhancement. (PSR Adden., at 4.)

Regarding the drug quantity, Bedell argued he should be held responsible only for the quantity of drugs that he personally agreed to acquire from Wheeler for distribution. (PSR Adden., at 1-2.) Bedell objected to the drug-premises enhancement on the ground that he had no possessory interest in Nichole Bedell's home and did not control the access or activities there. (PSR Adden., at 4.)

With respect to the aggravating-role enhancement, Bedell specifically "object[ed] to the facts asserted in support of the role enhancement" and identified paragraphs 22, 33, and 36 of the PSR. (PSR Adden., at 4.) These paragraphs alleged that Bedell had sent Nichole Bedell to sell heroin to Mueller (PSR ¶ 22), that Rice assisted Bedell with distributing heroin (PSR ¶ 33), and that Nichole Bedell kept a safe in her house to store heroin for Bedell and occasionally drove Bedell around while he sold heroin (PSR ¶ 36). Bedell "object[ed] to the factual assertion that he directed N. Bedell to conduct drug transactions or that Rice assisted him in drug distribution." (PSR Adden., at 4.) He argued that "[a]ny participation of N. Bedell and Ms. Rice in the offense conduct was not at the recruitment or direction of Mr. Bedell." (PSR Adden., at 4.)

Finally, Bedell argued that the criminal-livelihood enhancement should not apply because the aggravating-role enhancement is a prerequisite, and also because his income should be determined according to his net profit from drug sales, excluding the value of cash and other items seized by law enforcement. (PSR Adden., at 3.)

In response to Bedell's objections, the probation office argued that the drug quantity should include drugs distributed by Wheeler because "[t]he evidence in this case strongly supports that the defendant and Wheeler worked

together closely within the drug organization." (PSR Adden., at 2.) The probation office defended the drug-premises enhancement on the ground that Bedell kept a safe to store drugs for distribution at Nichole Bedell's home and "held a managerial role over" her. (PSR Adden., at 2.) The probation office argued that the aggravating-role enhancement was appropriate due to Bedell's supervision of Nichole Bedell and Rice. (PSR Adden., at 5.) The probation office further maintained that the criminal-livelihood enhancement was proper given the amount of money Bedell received from drug sales. (PSR Adden., at 4.)

Bedell and the Government both filed sentencing memoranda prior to the sentencing hearing. Bedell expanded upon his objections to the PSR's recommendation regarding drug quantity and argued that the relevant drug quantity should be 10 kilograms of fentanyl, which corresponds to a base offense level of 34. (R. Doc. 633, at 2); *see also* U.S.S.G. § 2D1.1(c)(3). He also elaborated upon his objections to the drug-premises enhancement, and he requested a below-Guidelines sentence. (R. Doc. 663, at 3-4, 8.) The Government argued in favor of the PSR's recommendations regarding drug quantity and the offense-level enhancements and recommended a sentence of 288 months' imprisonment on Count One and a consecutive 60 months on Count Twenty Five. (R. Doc. 665.)

## C.     *Sentencing*

The district court took up Bedell's objections to the PSR at the beginning of his sentencing hearing. (Sent. Tr., at 4.)[2] Bedell argued in support of his objection to the recommended drug quantity. (Sent. Tr., at 4-6.) The district court noted that Bedell had pleaded guilty to a conspiracy and that "one significant aspect" of the drug-quantity determination was "the foreseeability." (Sent. Tr., at 5.) The court overruled Bedell's objection. (Sent. Tr., at 6.)

Regarding the offense-level enhancements for aggravating role and maintaining a drug premises, the parties rested on their written arguments, and the district court overruled Bedell's objections based on the probation office's rationale for applying the enhancements. (Sent. Tr., at 6.) The district court also overruled Bedell's objection to the criminal-livelihood enhancement. (Sent. Tr., at 7.) The court adopted the factual contents of the PSR and its recommended Guidelines calculations. (Sent. Tr., at 7.)

The district court found the Guidelines range to be 360 months to life on Count One and 60 months consecutive on Count Twenty Five. (Sent. Tr., at 10.) After considering the statutory sentencing factors in 18 U.S.C.

---

[2]"Sent. Tr." refers to the transcript of Bedell's sentencing hearing. (R. Doc. 681.)

§ 3553(a), the district court sentenced Bedell to a below-Guidelines sentence of 300 months' imprisonment on Count One and a consecutive 60 months on Count Twenty Five, to be followed by five years of supervised release. (Sent. Tr., at 11, 23-25.)

When explaining the sentence, the district court emphasized Bedell's history of violence, the fact that he was dealing drugs for profit, the high volume of drugs he was dealing, and the lenient sentences he had received for prior crimes. (Sent. Tr., at 23-26.) After imposing the sentence, the court granted the Government's motion to dismiss Counts Twenty Four and Twenty Six. (Sent. Tr., at 27.)

## SUMMARY OF THE ARGUMENT

The district court did not clearly err by basing its drug-quantity finding upon the drugs both Bedell and Wheeler distributed, rather than just the drugs Bedell himself distributed. Bedell coordinated and communicated closely with Wheeler, his father and co-conspirator, including about customers and Wheeler's source of supply. Bedell was an integral part of a drug conspiracy for which Wheeler was the primary source of supply. The drugs acquired and distributed by Wheeler were within the scope of the criminal activity Bedell agreed to jointly undertake, and they were also in furtherance of that criminal activity and reasonably foreseeable to Bedell.

The district court did err, however, by applying three offense-level enhancements for (1) an aggravating role, (2) maintaining a drug premises, and (3) criminal livelihood. Bedell specifically objected to the factual statements in the PSR supporting the aggravating-role and drug-premises enhancements, and the Government failed to present evidence supporting those enhancements at sentencing. The district court erred by applying those enhancements based upon objected-to and unproved facts in the PSR. The criminal-livelihood enhancement cannot apply unless the aggravating-role enhancement also applies.

Accordingly, this Court should affirm the district court's drug-quantity finding but reverse the district court's application of the three offense-level enhancements, vacate the judgment, and remand for resentencing.

# ARGUMENT

**The district court did not clearly err by finding the applicable drug quantity to be the total volume of drugs distributed by both Bedell and Wheeler, but it did err by applying three offense-level enhancements based upon objected-to and unproved allegations in the PSR.**

## A. *Standard of Review*

This Court "review[s] the district court's application of the sentencing guidelines de novo and its factual findings for clear error." *United States v. Angel*, 93 F.4th 1075, 1078 (8th Cir. 2024) (quotation omitted). With respect to a district court's drug-quantity finding, this Court reviews for clear error and "reverse[s] only when the entire record definitely and firmly illustrates that the lower court made a mistake." *United States v. Buford*, 42 F.4th 872, 876 (8th Cir. 2022) (cleaned up).

## B. *Discussion*

### 1. *The district court did not clearly err by finding Bedell accountable for the quantity of drugs distributed by both Bedell and Wheeler.*

The district court did not clearly err by finding Bedell accountable for between 12 and 36 kilograms of fentanyl based upon the quantity of drugs distributed by both Bedell and Wheeler. Under the Sentencing Guidelines, the base offense level for drug crimes is typically determined according to the quantity of drugs for which a defendant is accountable. *See* U.S.S.G.

§ 2D1.1(a)(5). The concept of relevant conduct is used to determine the applicable drug quantity. *See* U.S.S.G. § 1B1.3. The Guidelines provide that "in the case of a jointly undertaken criminal activity," such as a conspiracy, relevant conduct includes "all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity . . . ." U.S.S.G. § 1B1.3(a)(1)(B).

Put simply, "[i]n a drug conspiracy, a defendant is held responsible for all reasonably foreseeable drug quantities that were within the scope of the criminal activity that he jointly undertook." *United States v. Bennett*, 91 F.4th 918, 923 (8th Cir. 2024) (quotation omitted). "Factors relevant to foreseeability include whether the defendant benefitted from his co-conspirators activities and whether he demonstrated a substantial level of commitment to the conspiracy." *United States v. Williams*, 605 F.3d 556, 569 (8th Cir. 2010) (cleaned up).

"The Guidelines permit a district court to approximate the quantity of drugs for sentencing purposes where there has been no direct seizure of drugs directly establishing the relevant amount." *United States v. Bradley*, 643 F.3d 1121, 1126 (8th Cir. 2011) (cleaned up). "Moreover, the court can determine

drug quantity using imprecise evidence, so long as the record reflects a basis for the court's decision." *Id.* (quotation omitted).

Bedell's PSR estimated, and Bedell did not dispute, that the total quantity of fentanyl involved in the conspiracy of which he was a part was between 12 and 36 kilograms. (PSR ¶ 40.) Bedell's PSR estimated that Bedell personally sold approximately 10 kilograms of heroin or fentanyl. (PSR ¶ 39.) However, due to Bedell's jointly undertaken criminal activity with Wheeler, the district court held Bedell accountable for at least 12 kilograms of fentanyl rather than just the amount Bedell personally distributed. The unobjected-to factual statements in Bedell's PSR support the district court's finding. *See United States v. Lee*, 570 F.3d 979, 982 (8th Cir. 2009) (explaining that a "district court is entitled to rely on facts in the PSR when the defendant objects not to the facts themselves but to the PSR's recommendation based on those facts" (cleaned up)).

The drugs distributed by Wheeler were within the scope of the criminal activity Bedell agreed to jointly undertake. Wheeler was the primary local source of supply for the drug conspiracy. (PSR ¶¶ 4, 6.) Bedell was Wheeler's son, which gave Bedell unique access to the person supplying the conspiracy. (PSR ¶ 6.) Bedell's former wife and his mother were also members of the conspiracy. (PSR ¶ 6.) Bedell's comments to Lindsey, who was one of his

heroin customers, reveal that he viewed the drugs he was selling as "my dope" and "my daddy's dope." (PSR ¶ 10.)

Bedell was an integral part of the conspiracy. Law enforcement encountered Bedell and Wheeler carrying a large amount of cash while on their way to St. Louis, which is where Loggins, Wheeler's supplier, was based. (PSR ¶¶ 6, 12-13.) On the same day that Loggins was caught travelling from St. Louis to Springfield with over 400 grams of fentanyl to provide to Wheeler, Wheeler called Bedell to tell him Loggins was not answering his calls and to talk to Bedell about keeping half of some quantity of heroin for himself. (PSR ¶¶ 20-21; R. Doc. 496, at 2.) After law enforcement searched Bedell's home, Wheeler called Bedell to ask if the police had found Bedell's money. (PSR ¶ 28.)

Wheeler and Bedell supplied heroin to the same customers. After Wheeler became concerned law enforcement was investigating him, he introduced his customer Lindsey to Bedell so that she could start receiving heroin from Bedell. (PSR ¶ 9.) Martin first received heroin from Bedell but later received it directly from Wheeler. (PSR ¶ 35.) Most significantly, Wheeler gave Bedell a phone with numbers for some of Wheeler's customers so that Bedell could take over distributing heroin to those customers. (PSR ¶ 34.)

The fentanyl distributed by Wheeler was in furtherance of the jointly undertaken criminal activity and reasonably foreseeable to Bedell. The object of the conspiracy was to distribute heroin, so all the fentanyl Wheeler distributed was in furtherance of that goal. Bedell benefitted from Wheeler's distribution activities when he took over some of Wheeler's customers. Bedell knew Loggins was Wheeler's supplier, so all the fentanyl Wheeler was receiving from Loggins was foreseeable to Bedell. (PSR ¶¶ 21, 37.) Furthermore, Bedell knew at least several of Wheeler's customers, so it was obviously foreseeable to Bedell that Wheeler was distributing fentanyl to those customers. (PSR ¶¶ 9, 34-35.) Regarding the factors this Court has focused on when determining foreseeability, *see Williams*, 605 F.3d at 569, Bedell benefitted from Wheeler's activity of procuring drugs from Loggins, and Bedell displayed a substantial level of commitment to the conspiracy.

Bedell argues that "the scope of the agreed upon criminal activity is limited to the quantity of drugs that Mr. Bedell agreed to distribute on behalf of Mr. Wheeler and not the entirety of the conspiracy." (Bedell Brf., at 11.) But he does not attempt to explain how, given all the evidence of coordination and communication between himself and Wheeler, the district court clearly erred by finding the scope extended to the drugs Wheeler was distributing.

This Court has previously rejected positions similar to Bedell's argument here. In *United States v. Lewis*, the evidence showed the defendant was given half of the methamphetamine shipments a co-conspirator received each week for distribution and personal use. 976 F.3d 787, 797-98 (8th Cir. 2020). The evidence also showed a significant degree of coordination between the defendant and other members of the conspiracy. *Id.* at 792. This Court reasoned that "[t]he the meth shipments received by [the co-conspirator] were part of the same course of conduct or scheme as the conspiracy, reasonably foreseeable, and in furtherance of it." *Id.* at 797. Therefore, although the defendant argued that "the district court should have attributed to him only the meth he was responsible for distributing, not the entire amounts in the shipments [the co-conspirator received]," this Court held that "[t]he district court did not err in attributing the meth shipments to [the defendant]." *Id.* at 797-98.

Similarly, in *United States v. Shaw*, this Court held that the district court did not clearly err by attributing to defendant Basic the drugs sold by co-defendant Shaw. 965 F.3d 921, 926-27 (8th Cir. 2020). The evidence showed that Shaw had told Basic that Basic needed to make money selling fentanyl nasal spray. *Id.* at 926. "Therefore, it would have been reasonably foreseeable to Basic that Shaw would attempt to increase sales by distributing

the drug to others, even if Basic did not personally know" Shaw's customers. *Id.* at 927. "Thus, the district court did not clearly err in holding that a preponderance of the evidence supported finding that Shaw's fentanyl nasal spray transactions with [a third person] were attributable to Basic." *Id.*

Bedell also criticizes the district court for failing to make "particularized findings" about the scope of the criminal activity he agreed to jointly undertake and the foreseeability of the actions of other members of the conspiracy. (Bedell Brf., at 10-11.) Bedell did not object to the lack of particularized findings below, so his argument about the sufficiency of the court's findings is reviewable only for plain error. *See United States v. Jones*, 990 F.3d 1141, 1143 (8th Cir. 2021) (reviewing for plain error an argument that a district court failed to make an explicit finding under another provision of the Guidelines); *Greer v. United States*, 593 U.S. 503, 507-08 (2021) (explaining the requirements for plain error review).

The district court did not err, plainly or otherwise. Bedell relies on a case from the Fourth Circuit, which requires district courts "to make *particularized* findings with respect to *both* the scope of the defendant's agreement *and* the foreseeability of the conduct at issue." *United States v. Flores-Alvarado*, 779 F.3d 250, 256 (4th Cir. 2015) (cleaned up). But he cites no case from this Court imposing such a requirement. This Court has rather

observed that "[t]he extent to which specific findings are required will of course vary with the circumstances surrounding a particular defendant and her conspiracy offense." *United States v. Miller*, 698 F.3d 699, 709 (8th Cir. 2012). This Court has affirmed drug-quantity determinations without insisting upon particularized findings as to scope and foreseeability. *See United States v. Flores*, 73 F.3d 826, 835 (8th Cir. 1996) (holding that the district court complied with what is now Federal Rule of Criminal Procedure 32(i)(3) by acknowledging the defendant's objection to drug quantity and explicitly rejecting it based upon the record and the court's notes of trial testimony); *United States v. Edwards*, 994 F.2d 417, 423 (8th Cir. 1993) (rejecting an argument that the district court failed to make specific findings as to the foreseeability of drug quantity where the defendants did not argue foreseeability at sentencing or challenge the facts alleged in their PSRs, and the district court overruled all their sentencing objections and found the quantities alleged in the PSRs to be accurate).

Moreover, even the Fourth Circuit case Bedell relies upon recognized that adopting a PSR "can be a satisfactory means of resolving factual disputes" when the facts alleged in the PSR support the PSR's recommendation. *Flores-Alvarado*, 779 F.3d at 256. The district court in this case adopted the

PSR (Sent. Tr., at 7), and as explained above, the unobjected-to facts recited in the PSR support the court's drug-quantity finding.

The district court therefore did not plainly err by failing to make the "particularized findings" Bedell now wishes it had. Even if the district court somehow plainly erred, Bedell does not attempt to show, as he must under plain error review, *see Greer*, 593 U.S. at 507-08, a reasonable probability that the court would have found a lower drug quantity had it provided the explanation he believes was required.

In any event, if this Court reverses the district court's application of the three offense-level enhancements and remands for resentencing, as proposed in Point B.2, *infra*, then any error in the district court's drug-quantity finding will be harmless. Without the three offense-level enhancements, Bedell's offense level will be set by the Guidelines' career-offender provision, U.S.S.G. § 4B1.1, not the drug quantity. (PSR ¶ 53.) Bedell does not dispute that he qualifies as a career offender. He acknowledged in his sentencing memorandum that if the district court sustained his objections to the enhancements, his offense level would be set by the career-offender provision. (R. Doc. 663, at 4.) He appears also to have acknowledged at sentencing that he qualifies as a career offender. (Sent. Tr., at 10.) Accordingly, even if the district court clearly erred in its drug-quantity finding, the error will be

harmless if Bedell is resentenced as a career offender. *See United States v. Wiggins*, 747 F.3d 959, 963-64 (8th Cir. 2014) (reasoning that any error in the drug-quantity calculation would be harmless if the defendant qualified as a career offender).

2. *The district court erred by applying the three offense-level enhancements.*

The Government agrees with Bedell that the district court erred by increasing his offense level for (1) an aggravating role, (2) maintaining a drug premises, and (3) criminal livelihood. After Bedell objected to the facts alleged in the PSR in support of these enhancements, the Government needed to introduce evidence at sentencing to prove those facts and failed to do so.

"It is well-established that, when a defendant disputes material facts in his PSR, the sentencing court must either refuse to take those facts into account or hold an evidentiary hearing." *United States v. Mayokok*, 854 F.3d 987, 991 (8th Cir. 2017) (quotation omitted); *see also* Fed. R. Crim. P. 32(i)(3) (directing that a sentencing court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing"). "If the defendant objects to the factual basis for a sentencing enhancement, and the government fails to present evidence to prove that factual basis by a

preponderance of the evidence, it is error to apply the enhancement." *Mayokok*, 854 F.3d at 991 (quotation omitted). "[T]he PSR is not evidence, nor is it a legally sufficient basis for findings on contested issues of material fact." *United States v. Berrier*, 28 F.4th 883, 887 (8th Cir. 2022).

In his objection to the aggravating-role enhancement, Bedell specifically objected to the facts stated in paragraphs 22, 33, and 36 of the PSR. (PSR Adden., at 4.) These paragraphs alleged that Bedell had sent Nichole Bedell to sell heroin to Mueller (PSR ¶ 22), that Rice assisted Bedell with distributing heroin (PSR ¶ 33), and that Nichole Bedell kept a safe in her house to store heroin for Bedell and occasionally drove Bedell around while he sold heroin (PSR ¶ 36). The probation office relied on the facts in these paragraphs to support its recommendation of an aggravating-role enhancement, as well as an enhancement for maintaining a drug premises, which was based upon Bedell keeping a safe with drugs at Nichole Bedell's house. (PSR ¶ 47; PSR Adden., at 4-5.) At sentencing, the district court relied on the probation office's rationale when overruling Bedell's objection to these enhancements. (Sent. Tr., at 6.) Furthermore, the criminal-livelihood enhancement depends on the aggravating-role enhancement, because it applies only if a defendant also receives an adjustment for an aggravating role under U.S.S.G. § 3B1.1. *See* U.S.S.G. § 2D1.1(b)(16)(E).

The Government did not introduce evidence at sentencing to prove the facts alleged in the disputed paragraphs of the PSR. It was therefore error for the district court to apply the offense-level enhancements that were based upon those disputed paragraphs. This Court should reverse the district court's application of the three offense-level enhancements, vacate the judgment, and remand for resentencing.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's finding with respect to drug quantity but reverse the district court's application of the three offense-level enhancements, vacate the judgment, and remand for resentencing.

Respectfully submitted,

TERESA A. MOORE
  United States Attorney

By     /s/ *David Wagner*

David WAGNER
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,684 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 software in 14-point, Times New Roman font. Furthermore, the document has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

 /s/ *David Wagner*
David Wagner
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2024, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  A paper copy will be served on participants in the case by U.S. Mail, postage prepaid, within five days of the Court's notice that the brief has been reviewed and filed.

I hereby certify that a copy of the Government's brief was mailed on May ___, 2024, to:

David J. Guastello
811 Grand Boulevard, Suite 101
Kansas City, Missouri  64106

*Attorney for Appellant*

 /s/ *David Wagner*_____
David Wagner
Assistant United States Attorney